# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CASE NO. 3:20-CR-295-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| JONATHAN SHANE STAMPER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion And Incorporated Memorandum Of Law To Suppress Illegal Stop And Illegal Search" (Document No. 30) filed October 27, 2021. The United States filed the "Government's Response To Defendant's Motion To Suppress" (Document No. 33) on November 18, 2021. An evidentiary hearing was held before the undersigned on December 9, 2021, with Defendant personally present with counsel. Having carefully considered the briefs, testimony, and oral arguments, the undersigned will respectfully recommend that the motion be <u>denied</u>.

## I.   PROCEDURAL HISTORY

On August 19, 2020, Defendant Jonathan Shane Stamper ("Defendant" or "Stamper") was indicted for (1) conspiracy to distribute and to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846; (2) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A); (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and (4) felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Document No. 3). Defendant, through counsel, filed a "Motion And Incorporated Memorandum Of Law To Suppress Illegal

Stop And Illegal Search" (Document No. 30) on October 27, 2021, seeking to suppress certain Government evidence in the case. The "Government's Response To Defendant's Motion To Suppress" (Document No. 33) was filed on November 18, 2021. The Court noticed a hearing on the matter.

The motion came on for a hearing on December 9, 2021, at which time several witnesses were presented by the prosecution and cross-examined by the defense. The principal questions presented by the Defendant's motion are whether, based upon the information available to them, law enforcement had reasonable suspicion to stop Defendant's car, briefly detain him, conduct a dog-sniff of the exterior of his car, and subsequently search the car. It was that search that ultimately led to the seizure of the methamphetamine and the firearm that forms the basis of the charges.

## II. FACTUAL SUMMARY

As noted, the Court conducted a hearing on this matter on December 9, 2021, at which the Government presented witness testimony and both the Government and the Defense presented argument. The Government presented the testimony of three law enforcement officers – Lieutenant Ben Baker, Detective Anthony Mason, and Deputy Jonathan Presson of the Union County Sherriff's Office ("UCSO"). Evidence also included cross-examination of the witnesses.

First, the Government presented the testimony of Lieutenant Ben Baker. Lieutenant Baker has been employed with the narcotics division of the UCSO since 2016. Lieutenant Baker testified that on January 3, 2020, he was supervising a team of officers in the narcotics division. The officers were conducting a planned operation in the Waxhaw-Mineral Springs area, working with a cooperating informant whom they encountered in a buy-bust operation earlier in the day who provided the law enforcement team details regarding a "Shane Stamper." Lieutenant Baker was

2

stationed at the Western Union Elementary School on Lee Massey Road with the informant. On cross-examination, Lieutenant Baker indicated that he had no prior relationship with the informant. Stamper, according to the informant's tip, was a white male in his mid-30's or 40's who the informant alleged was supposed to meet with the informant in the Mineral Springs area later that same day to sell methamphetamine. During Lieutenant Baker's time with the informant, the informant was in communication with Stamper via text message. Stamper provided updates regarding his location to the informant, which the informant communicated to Lieutenant Baker. Lieutenant Baker then relayed those updates to his team in real-time via an encrypted radio channel (which, defense counsel pointed out on cross-examination meant that no recording of the team's communications amongst each other exists). According to the informant, Stamper was staying at the Hampton Inn in Matthews, and he would be traveling from there to the buy location in Mineral Springs. First, though, Stamper texted the informant that he needed to stop for "oil." Lieutenant Baker, as stated, relayed these details to his team. One member of the team initially went to the Hampton Inn looking for Stamper without success – he had already left the hotel and was traveling towards Mineral Springs.

On cross-examination, Defendant's counsel inquired about the lack of body-worn camera footage from the incident. Lieutenant Baker testified that it was the policy of the UCSO for narcotics division team members not to wear body-worn cameras to protect their anonymity. He testified that given that much of the narcotics division's work was performed in an undercover capacity, body-worn camera usage was often not possible because it might reveal their identities and thereby inhibit the division's mission.

Defendant's counsel also inquired about the relative brevity of Lieutenant Baker's written report summarizing the operation – which counsel pointed out was written about eight months

3

Case 3:20-cr-00295-FDW-DCK    Document 37    Filed 01/06/22    Page 3 of 19

following the traffic stop and search of Stamper's car. Lieutenant Baker indicated that his drafting of a report sometimes occurred after significant time had passed from the date of the operation because other team members had primary responsibility for drafting reports. These other team members would only later alert him if his report was missing from the incident file.

The Government next presented the testimony of Detective Mason. Detective Mason has been employed with the UCSO for almost five years. He presently works on the DWI task force of the UCSO. Previously, though, he worked in the narcotics division for approximately nine months, and he was working in that division during the operation at issue on January 3, 2020. Upon receiving details about Stamper from Lieutenant Baker, Mason drove to the Hampton Inn in Matthews to attempt to locate Stamper there. From what Lieutenant Baker told him (according to the informant's information), Mason was aware that he was looking for an approximately 44-year-old white male who was carrying a gun and driving a white Nissan Murano.

Upon arrival at the Hampton Inn, Baker told Mason that Stamper had already left to drive to the deal location. Mason recounted that he thereafter drove south on Potter Road through Stallings, looking for Stamper's car while en route to the deal location. Mason believed that this route would be the most direct route to take between the Hampton Inn and Mineral Springs. Baker also told Mason that Stamper was planning to stop for oil. Mason, having learned this information, stopped at the gas station near Rocky River Road and NC-84, which is east of Mineral Springs. At the gas station, Mason saw a subject that fit Stamper's description. He saw a white Nissan Murano with chrome wheels, prompting him to run the tag on the vehicle. Mason indicated that the tag on the vehicle did not match the records in the system – the tag was registered to a Chevy Silverado owned by a "Linda Stamper," suggesting that it was fictitious. Displaying a fictitious tag is a violation of North Carolina law.

Mason then waited for Stamper to leave the gas station parking lot, after which he followed Stamper in his car toward Mineral Springs. At 1:20 pm on January 3, Mason initiated a traffic stop of Stamper's car on the shoulder of South Potter Road in downtown Mineral Springs. Mason indicated that Stamper was then detained while an officer moved Stamper's vehicle off the road to allow for the flow of traffic to proceed unimpeded. Mason ran the VIN number on Stamper's car and checked the registration status, all while Deputy Presson was conducting a dog sniff on the car. According to Mason, there was no gap in time between the dog sniff and his own check of the car's VIN number and registration status – they occurred simultaneously.

On cross-examination, defense counsel inquired as to why Detective Mason did not stop Stamper's car earlier when he first encountered Stamper at the Shell station. Mason indicated that for displaying a fictitious tag, traffic stops must occur only on streets and highways – the gas station, therefore, would not have been a proper location for the stop.

The Government next presented the testimony of Deputy Presson. Deputy Presson works as a K-9 handler with the narcotics division of the UCSO, and he has been serving in that capacity for seven years. Atos is Presson's K-9 with which he has worked since 2012. Deputy Presson indicated that on January 3, 2020, he assisted Mason with the traffic stop of Stamper's car. Presson recounted that after Mason had stopped the vehicle on the shoulder of the road, Presson detained Stamper with handcuffs. Handcuffs were necessary as a safety measure, Presson said, because Stamper purportedly had narcotics and a firearm in his possession. Presson then had Atos conduct a K-9 sniff around the exterior of Stamper's vehicle, proceeding counter-clockwise. Atos, Presson indicated, is certified to do dog sniffs, and Presson regularly maintains his certifications. A standard alert, Presson said, is when Atos exhales out of his nose, backs up, and barks – an indication that Atos has located the source of the odor. And, when Atos begins to breathe more

5

deeply, heavily, and with greater speed, that is an indication that he is trying to locate the source of the odor. On the sniff of Stamper's vehicle, Presson said that Atos exhibited this change in behavior to suggest the presence of a narcotic in the vehicle.

On cross-examination, defense counsel inquired about whether the smell from the buy-bust involving the informant earlier in the day could have been transferred via law enforcement. Defense counsel surmised that since at least some of the same officers present at the traffic stop involving Stamper were involved in the buy-bust earlier with the informant, presumably handling drugs, those officers might have inadvertently transferred the odor of drugs to Stamper's vehicle. Presson also reaffirmed Detective Mason's statement that there was no delay between the dog sniff and the check of Stamper's vehicle registration status and VIN number – both were occurring simultaneously, and the dog sniff did not take longer than the records check. In total, Presson estimated roughly that the sniff took about ten to twelve minutes.

The Government then recalled Detective Mason. The prosecution asked Mason on direct whether he could estimate the length of time it took to conduct the dog sniff and check Stamper's vehicle's registration status and VIN number. Mason estimated that the encounter took approximately five to eight minutes – and in any case, there was no delay in his recollection for finishing the dog sniff. In fact, Mason testified that the dog sniff was already complete when he received the information from his check of the systems for the vehicle registration status and VIN number. In total, Mason estimated that the traffic stop – from pulling Stamper's car over on the shoulder of the road to the conclusion of the encounter – lasted approximately twelve to fifteen minutes.

## III. STANDARDS OF REVIEW

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

Reasonable suspicion means something "more than an 'inchoate and unparticularized suspicion or 'hunch''" but "less…than probable cause." Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27). In order to meet this burden, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," establish reasonable suspicion of criminal activity. Terry, 392 U.S. at 21. The Fourth Circuit describes the reasonable suspicion standard as a "commonsensical" one, thus giving credit to "the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Courts evaluating the totality of the circumstances to determine whether an officer had reasonable suspicion can credit as one factor in such analysis officers' "own experiences and specialized training [allowing them] to make inferences from and deductions about the cumulative information available." Arvizu, 534 U.S. at 266. The standard is not an exacting one – given that "the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous." Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001).

Reasonable suspicion necessary to make a stop can be obtained from an informant's tip, so long as the tip "demonstrate[s] sufficient indicia of reliability." Navarette v. California, 572 U.S. 393, 397 (2014) (internal quotations and citations omitted). The requisite indicia of reliability can come in two varieties. The first is where officers can "corroborat[e] [] certain details" of the tip because by "accurately predicting future behavior, the tipster demonstrate[s] a special familiarity with [the suspect's] affairs, which in turn impl[y] that the tipster had access to reliable information about that individual's illegal activities." Id. at 398; see also United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013) ("[a]n informant may…prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place"). "[N]ot every detail mentioned by the tipster [needs to have been] verified" for reasonable suspicion to exist on the basis of a tip whose reliability is established by the accuracy of predictive information. Alabama v. White, 496 U.S. 325, 331 (1990). The second variety is where an informant has provided accurate tips to law enforcement in the past – not at issue in this case, as the informant had no prior informant relationship with the UCSO. Navarette, 572 U.S. at 398 ("an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, including the claim that the object of the tip is engaged in criminal activity") (internal quotations and citations omitted).

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). However, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

The probable cause standard does not:

> require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir.1993); accord Ornelas v. United States, 517 U.S. 690, 696 (1996) (probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found").

Furthermore, the Fourth Amendment is implicated in traffic stops of vehicles. "A traffic stop of a vehicle constitutes a seizure within the meaning of the Fourth Amendment and is permissible if the officer has probable cause to believe a traffic violation has occurred…or a reasonable suspicion of unlawful conduct." United States v. Wheeler, 317 F. App'x 298, 299 (4th Cir. 2008). This is true regardless of whether the officer's motivations for the traffic stop are larger than the mere traffic violation itself – that is, having to do with suspicion of greater criminal activity. See United States v. McCoy, 2018 WL 1144591, at *2 (W.D.N.C. Mar. 2, 2018) (citing United States v. Whren, 517 U.S. 806, 813 (1996) ("[t]he officer's subjective motivation in making the stop is unimportant; it only matters whether the basis for the stop was objectively reasonable")).

During a lawful traffic stop, an officer "may conduct certain unrelated checks…[but] he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 575 U.S. 348, 355 (2015). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop…and attend to related safety concerns." Id. at 354. The usual checks during a traffic violation "involve checking

9

the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. Unrelated checks might include, for example, a dog sniff, for "a dog sniff is not fairly characterized as part of the officer's traffic mission," but rather it "is a measure aimed at detect[ing] evidence of ordinary criminal wrongdoing." Id. at 355-56 (internal quotations and citations omitted). "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." Illinois v. Caballes, 543 U.S. 405, 410 (2005). So, conducting a dog sniff is not one of those "tasks tied to the traffic infraction," meaning that it may occur so long as it does not take longer than the usual checks performed during a regular traffic stop. Id. at 354. This rule applies, however, only when *other* reasonable suspicion of criminal activity is not present – in that scenario, the rule established by the Supreme Court in Rodriguez would not apply, and the dog sniff can prolong the traffic stop. United States v. Villavicencio, 825 F. App'x 88, 101 (4th Cir. 2020).

## IV. DISCUSSION

The central issues presented by Defendant's "Motion And Incorporated Memorandum Of Law To Suppress Illegal Stop And Illegal Search" (Document No. 30) are simple: did law enforcement have probable cause to make a traffic stop, did law enforcement conduct a lawful dog sniff of Defendant's vehicle, and did law enforcement subsequently have probable cause based on a dog sniff and an informant's tip to conduct a search of Defendant's vehicle during that traffic stop? The Court finds that the UCSO did have probable cause to make a traffic stop based on a display of a fictitious tag, and officers subsequently conducted a lawful dog sniff of the Defendant's vehicle – without delay between the ordinary checks incident to a traffic stop and the

10

Case 3:20-cr-00295-FDW-DCK   Document 37   Filed 01/06/22   Page 10 of 19

conclusion of the dog sniff – that supplied probable cause to search the car. Even *if* there was a delay, however – which there was not according to the evidence presented at the hearing – the Court concludes that law enforcement had reasonable suspicion to continue the dog sniff even past the conclusion of the traffic stop based on the informant's reliable tip. The dog alert to the presence of narcotics and the informant's tip then yielded the necessary probable cause to search the car.

The Defendant argued at the hearing that the dog sniff prolonged the traffic stop in violation of the Fourth Amendment because there was no reasonable suspicion to permit a delay between the termination of the traffic stop and the conclusion of the dog sniff.[1] The Government, by contrast, argued in its responsive brief that "[t]he open-air sniff occurred contemporaneously with the registration violations and the propriety of the Defendant's license…the open-air sniff in this matter was [therefore] a permissible, lawful investigative technique." (Document No. 33, pp. 6-7). Respectfully, the Court concludes based on the totality of the testimony presented at the hearing that the evidence indicates that there was no delay – the dog sniff and Detective Mason's check of Stamper's vehicle's registration status and VIN number occurred simultaneously. Moreover, even if there was a lag between the termination of the vehicle records check and the conclusion of the dog sniff, the UCSO possessed the requisite reasonable suspicion because of the tip to continue the dog sniff.

The Court's analysis will proceed sequentially through the various steps of the incident at issue. First, it is clear that Detective Mason had probable cause to initiate a traffic stop. Given that a traffic stop of a vehicle is a seizure, it must comport with the Fourth Amendment. Rodriguez,

---

[1] The undersigned notes that Defendant's motion focuses too heavily on the informant's lack of prior relationship with law enforcement, thereby suggesting that the informant's anonymity and unknown reliability undercut the dependability of the tip. See (Document No. 30, p. 7) (the "errors in the information given by the informant further undercut any iota of credibility the informant had…UCSO simply did not have enough reliable information to establish the basis for this stop"). The motion itself does not discuss the argument that Defendant's counsel made at the hearing: that the dog sniff prolonged the traffic stop in violation of the Fourth Amendment.

11

575 U.S. at 354.  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810.  Detective Mason undoubtedly had probable cause to believe that a traffic violation occurred – he identified Defendant Stamper at the Shell gas station, ran the tag on the vehicle through his system, and observed that it was registered to a Chevrolet Silverado instead of the Nissan Murano to which it was affixed.  Law enforcement thus observed firsthand a violation of North Carolina law which prohibits the display of a license plate on a vehicle to which the plate is not registered.  N.C. Gen. Stat. § 20-111(3).  Thus, Detective Mason acted within the scope of the Fourth Amendment by stopping Defendant Stamper's car after observing a traffic violation.  See Branch, 537 F.3d at 335 ("[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop").

After the stop itself – that is, after Detective Mason caused Defendant Stamper to pull over onto the shoulder of the road – law enforcement was justified to perform tasks incident to a routine traffic stop on account of the fictitious tag.  See United States v. Hill, 852 F.3d 377, 382 (4th Cir. 2017) (citing Rodriguez, 575 U.S. at 355) ("[a]n officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants").  For this reason, Detective Mason was entitled to run a check of Defendant Stamper's vehicle registration status and to verify the VIN number on the car.

During the traffic stop, "officers also may engage in other investigative techniques unrelated to the underlying traffic infraction…[s]uch unrelated activity is permitted under the

12

Case 3:20-cr-00295-FDW-DCK    Document 37    Filed 01/06/22    Page 12 of 19

575 U.S. at 354.  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810.  Detective Mason undoubtedly had probable cause to believe that a traffic violation occurred – he identified Defendant Stamper at the Shell gas station, ran the tag on the vehicle through his system, and observed that it was registered to a Chevrolet Silverado instead of the Nissan Murano to which it was affixed.  Law enforcement thus observed firsthand a violation of North Carolina law which prohibits the display of a license plate on a vehicle to which the plate is not registered.  N.C. Gen. Stat. § 20-111(3).  Thus, Detective Mason acted within the scope of the Fourth Amendment by stopping Defendant Stamper's car after observing a traffic violation.  See Branch, 537 F.3d at 335 ("[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop").

After the stop itself – that is, after Detective Mason caused Defendant Stamper to pull over onto the shoulder of the road – law enforcement was justified to perform tasks incident to a routine traffic stop on account of the fictitious tag.  See United States v. Hill, 852 F.3d 377, 382 (4th Cir. 2017) (citing Rodriguez, 575 U.S. at 355) ("[a]n officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants").  For this reason, Detective Mason was entitled to run a check of Defendant Stamper's vehicle registration status and to verify the VIN number on the car.

During the traffic stop, "officers also may engage in other investigative techniques unrelated to the underlying traffic infraction…[s]uch unrelated activity is permitted under the

12
Case 3:20-cr-00295-FDW-DCK    Document 37    Filed 01/06/22    Page 12 of 19

Fourth Amendment only as long as that activity does not prolong the roadside detention for the traffic infraction." Hill, 852 F.3d at 382. One of those unrelated activities that officers can conduct during a traffic stop is a "'dog sniff' around a vehicle…in an attempt to identify potential narcotics." Id. Deputy Presson employed his K-9, Atos, to conduct a dog-sniff around Stamper's vehicle, and both he and Detective Mason testified that the dog sniff concluded prior to the completion of the records check on the vehicle. According to the case law, the evidence therefore indicates that the dog sniff and subsequent search were thus entirely within the bounds of the Fourth Amendment. Defense counsel attempted to suggest at the hearing that the Court should quantify the length of time that the entire detention took, suggesting that there might be some threshold number at which the detention period and dog sniff took too long and thus were in violation of the Fourth Amendment. Not so. The Government correctly argued in opposition, in essence, that what matters is not the numerical amount of time that the detention lasts, but rather, whether the dog sniff was completed such that the duration of the stop lasted no longer than necessary to address traffic violation concerns. See Rodriguez, 575 U.S. at 354. Here, "the dog sniff took place, in its entirety, before [or at the same time at which officers] completed the stop with Defendant." United States v. Podbielski, 2021 WL 3560980, at *8 (W.D.N.C. Aug. 11, 2021).

The Court also highlights that whether the dog sniff actually did last slightly longer than the traffic stop itself – which it did not – is ultimately beside the point. Here, officers possessed reasonable suspicion of drug possession such that the dog sniff could permissibly have lagged in time behind the traffic stop. According to the Supreme Court, *without* other reasonable suspicion of criminal activity, a dog sniff may last only so long as the traffic stop itself. Rodriguez, 575 U.S. at 357 ("[t]he critical question…is not whether the dog sniff occurs before or after the officer issues

a ticket…but whether [to be consistent with the Fourth Amendment] conducting the sniff 'prolongs' – *i.e.*, adds time to – 'the stop'"). Nonetheless, where an officer does possess reasonable suspicion of other criminal activity – that is, of illegal activity beyond the traffic violation itself – the dog sniff *can* last beyond the time necessary to conclude the traffic stop. See Branch, 537 F.3d at 336 ("[i]f a police officer wants to detain a driver beyond the scope of a routine traffic stop…he must possess a justification for doing so other than the initial traffic violation…a prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot"). Here, for the reasons explained below, the informant's tip and real-time information that was supplied to law enforcement provided the UCSO with reasonable suspicion that Defendant Stamper was engaged in illegal drug activity. Thus, even hypothesizing about a potential time delay between conclusion of the traffic stop and conclusion of the dog sniff, the officers possessed reasonable suspicion to eradicate any Fourth Amendment-related concerns about the lawfulness of the dog sniff. See Villavicencio, 825 F. App'x at 101; see also United States v. Harry, 930 F.3d 1000, 1005 (8th Cir. 2019) ("[e]ven if the dog sniff had extended the traffic stop, the extension would have been permissible, as the CI's tip provided reasonable suspicion for Deputy Kearney to perform the drug search").

According to the parties' briefs and the testimony presented at the hearing, the informant told the UCSO that Shane Stamper of Fort Mill, South Carolina would drive a white Nissan Murano with chrome wheels from Matthews to Mineral Springs, transporting methamphetamine and carrying a gun. (Document No. 30, p. 2); (Document No. 33, p. 2). Mr. Stamper, according to the informant, was a 44-year-old white male, who was staying at a Hampton Inn in Matthews. Id. The informant remained in communication with Stamper by text message, and thus the informant was able to provide real-time updates to Lieutenant Baker, which were then relayed to

14

the larger team, about Defendant Stamper's whereabouts. Upon Detective Mason's arrival at the Hampton Inn, Lieutenant Baker told him that Stamper had already moved from that location towards Mineral Springs – but that he first needed to stop for oil. Detective Mason then traveled towards Mineral Springs on what he believed to be the most direct route, stopping at a Shell gas station. It was at the gas station that he observed Stamper – doing exactly what the informant had told law enforcement he would be doing. Stamper was largely exactly as the informant described – a white male driving a white Nissan Murano with chrome wheels, traveling in the direction of the buy location in Mineral Springs and pumping gas for his car. Defendant's statement to the contrary in his motion that "the details given by the informant were not accurate" is a mischaracterization of the events. (Document No. 30, p. 6).

The accuracy of the details provided by the informant indicates that the UCSO had reasonable suspicion to believe that Defendant Stamper was engaged in the transportation of methamphetamine. See Navarette, 572 U.S. at 398 ("officers' corroboration of certain details made [an] anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity [because] [b]y accurately predicting future behavior, the tipster demonstrated a special familiarity with respondent's affairs"). Given that officers "sufficiently corroborated" the informant's details regarding Stamper – including his car, his location, and his description – the tip "furnish[ed] reasonable suspicion that [Stamper] was engaged in criminal activity." White, 496 U.S. at 331. Given the officers' valid reasonable suspicion of Stamper's criminal drug-related activity, even if the dog sniff did minimally extend the traffic stop by a few minutes, there were grounds to do so, under Rodriguez. 575 U.S. at 355.

The dog's alert to the presence of narcotics – which provided part of the probable cause basis for officers to search Defendant's car – is not challenged by Defendant. Nonetheless, the

15

undersigned will proceed through the sequential steps of the entire encounter for thoroughness, particularly because Stamper's motion seeks to suppress "all evidence recovered during or derived from the traffic stop of the Nissan vehicle on January 3, 2020." (Document No. 30, p. 8). At the outset, at this analytical stage, the undersigned emphasizes that the entire incident – from the seizure of the vehicle on account of the traffic stop to the search of Stamper's vehicle, leading to the recovery of narcotics and the firearm – was consistent with the Fourth Amendment for the reasons explained above and below.

Here, the dog sniff – combined with the informant's tip – provided probable cause to search Defendant's car. "The Supreme Court has repeatedly held that a drug dog sniff is not a search under the Fourth Amendment and a reliable dog alert provides probable cause that illegal drugs are present." United States v. Age, 447 F. App'x 470, 471 (4th Cir. 2011) (citing Caballes, 543 U.S. at 409-10). There are thus two components to a dog sniff's validity – whether there was an alert in the first place, and whether the alert was reliable. Neither of these aspects are contested in Defendant's motion to suppress, nor were they contested at the hearing – but again, the undersigned will explain why there is no Fourth Amendment issue with the dog sniff for completeness.

Whether the K-9 in this case alerted is also not at issue. But, since Defendant seeks to suppress all evidence from law enforcement's encounter with him on January 3, 2020 during the traffic stop and subsequent dog sniff and search, the undersigned will proceed with the analysis. "An 'alert' would ordinarily refer to the specific behavior a dog is trained to do when he encounters the source of the odor he is trained to detect." United States v. Wilson, 995 F. Supp. 2d 455, 473 (W.D.N.C. 2014). Here, Atos' handler, Deputy Presson, testified that the K-9's standard positive alert for the presence of narcotics is a change in the dog's breathing – breathing faster, an exhale

16

of a deep breath, and a final backing up and correspondent bark. According to Deputy Presson, Atos exhibited all of these behaviors on January 3, 2020 during the sniff of Stamper's vehicle, in the area between the tire wheel and driver door seal. Thus, the Court concludes that there was a positive dog alert.

In order for a dog alert to be reliable, there must be some evidence "that the dog is trained and certified to detect controlled substances." United States v. Koon Chung Wu, 217 F. App'x 240, 245 (4th Cir. 2007). Deputy Presson testified at the hearing that the K-9 who performed the dog sniff at issue here, Atos, was trained in 2012 to perform narcotics sniffs. He also testified that he maintains regular certifications for Atos. Thus, the undersigned finds on the basis of evidence presented at the hearing that the dog alert was reliable. See United States v. Wai Lun Ng, 2007 WL 3046215, at *2 (W.D.N.C. Oct. 16, 2007).

Both the positive dog alert and the informant's information that Stamper was engaged in the selling of methamphetamine and carrying a firearm provided probable cause for officers to search his vehicle. Age, 447 F. App'x at 472 ("[b]ased on the totality of the circumstances, there was clear probable cause to search the vehicle"); Branch, 537 F.3d at 340, 341, n.2. And, pursuant to the Supreme Court's automobile exception, once law enforcement has probable cause to believe that a vehicle contains evidence of a crime, they may search the car without first obtaining a warrant. United States v. Ross, 456 U.S. 798, 799 (1982) (citing Carroll v. United States, 267 U.S. 132 (1925) ("a warrantless search of an automobile stopped by police officers who had probable cause to believe the vehicle contained contraband was not unreasonable within the meaning of the Fourth Amendment"). Furthermore, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Ross, 456 U.S. at 825; see also California v. Acevedo, 500 U.S. 565, 580

(1991) ("[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained"). Since police had probable cause to search the car, their recovery of "approximately 230 grams of methamphetamine in the center console and a loaded Taurus 9mm caliber pistol near the gear shift" was thus entirely reasonable within the bounds of the Fourth Amendment.

## V. CONCLUSION

The facts and legal issues here are thus straightforward. Law enforcement officers had probable cause to make a traffic stop of Defendant Stamper's vehicle based on the observation of the fictitious tag displayed on the Nissan Murano. Once stopped, officers were entitled to conduct a dog sniff around the perimeter of the vehicle. The dog sniff concluded prior to the records check of the vehicle, and thus, there was no issue with the dog sniff's legality. Even if there was a delay, however, the delay between conclusion of the traffic stop and conclusion of the dog sniff was justified by reasonable suspicion of illegal activity based on the informant's tip. Once the dog sniff supplied a positive alert, police had probable cause to search Defendant's car and seize the drugs and firearm contained therein. The entire encounter was thus consistent with the Fourth Amendment.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's "Motion And Incorporated Memorandum Of Law To Suppress Illegal Stop And Illegal Search" (Document No. 30) be **DENIED**.

## V. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact,

conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: January 6, 2022

David C. Keesler
United States Magistrate Judge